## THE STATE v. CHARLES PARRIS, Appellant.

#### Division Two, June 23, 1914.

RAPE: Evidence. The evidence in a prosecution for rape *held* insufficient to uphold a conviction.

Appeal from Iron Circuit Court.—*Hon. W. N. Evans,* Judge.

REVERSED.

*Edgar & Edgar* and *J. H. Raney* for appellant; *Orchard & Cunningham* of counsel.

*John T. Barker,* Attorney-General, for the State; *Paul P. Prosser* and *S. P. Howell* of counsel.

ROY, C.—The defendant was charged with rape in an information against him, Elmer Loyd, Charles

Middleton, Ora Robinson, Charles Dunn, William Brewer, Lemro Kelly and Arthur Parris. There was a severance. Defendant was convicted and sentenced to five years in the penitentiary. It is alleged that the offense occurred on October 19, 1912. The prosecutrix, Lily Mullane, was nineteen years old. She was born and reared in Virginia, near Richmond. She cannot read or write. She was married to Thomas J. Mullane in December, 1911. In August, 1912, she and her husband left Alexandria, Va., and tramped into Canada, and back through St. Louis, reaching Annapolis, in Iron county, about nine o'clock in the morning of the alleged offense. She testified that they traveled afoot and begged their food and lodging. It does not appear how they obtained any money. He often entered saloons and got drunk, while she waited on the outside nearby. When they reached the station at Annapolis, the defendant, Charles Parris, was sitting with Will Loyd in the door of the station. There was a well, a store and a hotel close to the station. The Mullanes got a drink at the well and started down the track south. Defendant testified that she winked and nodded at him as she passed. She denies it. Mrs. Mann, who kept the hotel, testified that Mrs. Mullane looked back as she started away. As the Mullanes passed down the track, Ralph Williams and the defendants Elmer Loyd, Charles Dunn and Charles Middleton followed some distance behind. There were others with them. Behind that crowd there followed a second company of young men, Irvin Lowness, Ora Robinson, Bill Brewer, this defendant Parris, and others. After going some distance down the track, the husband of prosecutrix went back and talked with the crowd of boys nearest him, then started back down the track towards his wife. The prosecutrix testified that he went back in response to a whistle or call. The defense denies that such whistle or call was made.

Joseph Lucy and John Thompson, two citizens living to the southward, were coming north along the railroad. They testified that the rock cut was a quarter of a mile or more south of the station and that they passed Mrs. Mullane two hundred yards north of the rock cut; that the first crowd of men was a hundred yards north of her, and that the men were sitting on the track. The second crowd was approaching forty yards to the north. They saw Mullane talking to the first crowd and saw him start in the direction of his wife who had stopped on the track. Lucy testified that as they passed the first crowd, some one said, "We will put them onto to her." Thompson testified that some one in the crowd said, "We'll wait and let those other fellows tackle her." He also testified that as they passed Mullane on the track, he did not notice that he was out of humor, that "he was just walking along like any other man."

The evidence for the defendant is to the effect that when Mullane talked with the men, it was arranged that for a money consideration they were to be allowed sexual intercourse with Mrs. Mullane. The men followed down the track and overtook the Mullanes. The defendant's account of what then occurred is as follows:

"A. He says, 'These boys have got a piece of money for you, if you want to make it; you know we are broke,' and she said, 'I don't know, I'm afraid it might be like it was up the road.'

"Q. Did she say how it was up the road? A. No, she didn't say how it was up the road; and he said, 'I believe this is a pretty nice bunch of boys,' and Elmer says, 'I've got a dollar if you want to make it,' and she said, 'I don't believe I want to,' and Mullane said, 'Go on, I believe this is a pretty nice bunch of boys,' and she repeated over, 'I'm afraid it might be like it was up the road.'

"Q. What else occurred? A. Then she says, 'Well, by God, give me five dollars,' and Elmer run his hand down in his pocket and pulled out the money and started to hand her a five dollar bill, and Mullane slapped him on the shoulder and says, 'Don't give her that much; that is too much for one man,' and he says, 'You all chip in and make it,' something like that, 'so that one man won't have to go so much,' and he slapped Elmer on the shoulder and said, 'By God, give me a cigarette,' and then Elmer said, 'If you are going with me, we'll have to go,' and they went on down the track, one on one side and the other on the other, I believe Elmer walked out on the edge of the ties."

Her account is as follows:

"Q. What occurred when your husband and these parties came up to where you were? A. Elmer Loyd asked me 'how about it?'

"Q. Well, what happened then? A. I told him no.

"Q. Go ahead. A. He throwed his arms around me and I throwed him off and he turned around and said, 'I asked you like a man, and if you don't choose to do it, I will make you,' and my husband turned around and said to me, 'For God's sake, go with him, you will have to go anyway.'

"Q. What was your husband doing when he said that to you? A. He was crying.

"Q. What appeared to be his condition at the time? A. He seemed like he was scared."

On her cross-examination the following occurred:

"Q. Your husband said, 'For God's sake, go with him, you will have to go anyway?' Yes, sir.

"Q. And you went? A. Yes, sir.

"Q. You didn't make any resistance? A. No, sir, not then.

"Q. Why didn't you? A. Because I was scared to death.

"Q. What were you scared at? A. Those fellows.

"Q. Had they threatened you or your husband in any way? A. No, sir.

"Q. Had they done anything to make you think that they would hurt you or harm you in any way physically? A. I don't know.

"Q. I am asking you if any of these boys had done anything in the way of making threats of personal injury to you or to your husband at that time? A. I can't remember.

"Q. Don't you know that they hadn't? A. I don't know sir.

"Q. You don't know—weren't you standing right there? A. Yes, sir.

"Q. And you know that you hadn't seen anything in the way of threats or violence, don't you know that? A. No, sir, I don't know it.

"Q. At the time Loyd made this statement to you, that was all that had been said or done by any of those boys, wasn't it? A. Yes, sir, that I remember.

"Q. That was what made you scared to death? A. Yes, sir.

"Q. So that you were afraid to holloa or make any resistance? A. Yes, sir.

"Q. So you simply walked off with Loyd? A. He had ahold of my hand.

"Q. Was he pulling you along? A. Yes, sir.

"Q. Anyway, you walked off down there with him without making any resistance? A. Yes, sir.

"Q. You got over the right of way fence? A. Yes, sir.

"Q. How did you get over? A. Climbed over.

"Q. Ahead of him? A. Yes, sir, he held the wire down.

"Q. And you got over and waited for him to climb over? A. Yes, sir.

"Q. You stood there and waited for him to climb over. If you were scared to death at that time, why didn't you run? A. How was I going to run, I was a stranger there.

"Q. Well, can you give any reason why you didn't run? A. No, sir.

"Q. Can you give any reason why you didn't holloa? A. I didn't holloa."

It is conceded that Loyd did not have intercourse with her. She testified that she prevented him by slapping, scratching and kicking him. He testified that when he saw her underclothing it was so unclean that he left and went up town. It is conceded that later in the day he was again in the company that was with her and he made no further attempt to have intercourse with her.

James Rutter testified that he was in Webb's store in Annapolis that day before noon and heard a conversation between Loyd and William Brewer, in which Brewer said, "I don't believe that was his wife. He wilted when you threw the gun on him," and that Loyd, putting his hand back this way (indicating) said, "I said stand, you s—of-a-b—. Boys, we will tie the s—of-a-b— to a rail."

On his cross-examination the following occurred:

"Q. Now, you have told about that conversation two or three different ways in these cases, haven't you? A. I don't think I have.

"Q. I will ask you if it isn't a fact that you have at times added considerable more than you have at other times? A. I have, yes, sir.

"Q. The first two or three trials of these cases you told a certain portion of what you have told now? A. That is correct.

"Q. Later on, you added some more? A. That is correct.

"Q. And tonight you left out part of some that you have told? A. That is correct.

"Q. And you never have told it right? A. Yes,. I have told it right; I told all that was asked me."

He stated that Irwin Lowness and Ora Robinson were present at that conversation. Loyd and Lowness denied that such conversation occurred. Robinson and William Brewer did not testify.

After Loyd left Mrs. Mullane, four others had intercourse with her. Then followed this defendant Parris. She testified that the four and Parris accomplished their purpose in spite of her resistance. She testified that while Parris was with her two older men came to where they were, from an eastern direction. Those two men were John Jackson and Drew Lewis, who were looking for some hogs. Those men testified that they saw the sexual act between her and Parris, and that she made no resistance.

Lewis testified as follows:

"Q. What did you say took place when Parris got up? A. He says to me and Jackson, 'Come over here, boys, I've found something,' and we walked over, and Parris took me kind o' by the arm and says, 'here is a man, he has got some money,' and I said, 'No, you are mistaken,' and she says to me, 'you are just like the rest of the boys, you've got no money,' and I said, 'You have struck me just right.'

"Q. Was that all of the conversation? A. Yes, sir, that is all that was said there. The man that was with her, he called her and she didn't come right then and he come over there.

"Q. Where did he call her from? A. From the railroad.

"Q. What did he say? A. He said, 'Come on, Lillie, let's go,' and she never went right then and he come over to where we was and he says, 'Now, Lillie, if you are through with the boys, let's go,' and they went over towards the railroad and me and Jackson went back through the field home, and afterwards we went to Des Arc."

Jackson and the defendant Parris corroborated that statement.

On cross-examination she testified:

"Q. I will ask you to state when these two men walked up there, if Charles Parris asked one of them, if he wanted some of it? A. I think he did.

"Q. And if the man didn't say, 'No, I don't believe I care for any.' A. Yes, sir, I think he did.

"Q. About that time your husband came from the railroad track to the fence? A. Yes, sir.

"Q. And said, 'Lillie, if you are through, come on, let's go?' A. Yes, sir.

"Q. Did you make any answer to that? A. I told him all right."

After she got back on the railroad, Lemro Kelly joined the company. During the trial of this defendant a separate information was filed against Kelly and he became a witness for the State. He testified that he and Charles Middleton, the defendant Parris, and the Mullanes started south down the track and passed some section men. He then testified as follows:

"Q. Now what, if anything, occurred when you got down about Benson switch? A. Well, after we crossed the bridge, there was them section men, and I stopped there and said, 'I'm not going no further,' and Jim Dean says, 'Why don't you go on and take the woman away from the man; if you are game, go on,' and Middleton said, 'You haven't had none, go on, you've got to go on,' and the man was taking on a little, and Parris or Middleton one says to him, 'You cheese it right now; I'll whip you if you don't hush up,' and Mullane went up and took his wife's hand and begged her to go with me.

"Q. You went with her, did you? A. Yes, sir.

"Q. And had intercourse with her? A. Yes, sir.

"Q. Then where did you go? A. I started back and met Middleton.

"Q. What happened then? A. Middleton went on and I went back up to where the man and Charley Parris.

"Q. What occurred when you got up to where the man and Charles Parris were? A. The man said, were we through, and asked me for a match, and I reached my hand to get a match and Parris said, 'Don't you take that, I'll kill you,' and he started off in a fast walk.

"Q. Where was Middleton and the woman? A. About where I left them.

"Q. Do you know what became of them? A. They went over to that shanty."

Dean and the other two section men testified for the defense denying that any such conversation occurred, and further stated that they did not notice any indications of trouble between the Mullanes and those with them when they passed by them.

W. L. Whittington, a signal repairman of the railroad, saw Mrs. Mullane when she was at the water tank a short distance south of Annapolis, and, about an hour later, he passed on his velocipede and saw the husband and the men with him half a mile south of the water tank. They were sitting on the railroad, and he noticed no sign of trouble among them.

Irvin Brewer, a second cousin of three of the defendants, was at work on the railroad three-quarters of a mile south of Annapolis. He testified that the Mullanes and those with them passed him and Frank Moss at work, and that they did not notice any sign of trouble among them.

John Lewis, the section foreman, testified that he passed about noon on a hand car and saw the Mullanes and the men with them near Benson's switch, and saw no indication of any trouble among them. Robert Seals and three other men were loading a car of lumber at Benson's switch. Seals testified for the defense that he saw Mrs. Mullane and Kelly go down the track

and disappear to one side, then come back upon the track, and saw her and Middleton go over to the shanty in sight about three hundred and fifty yards distant. Afterwards, Kelly and Parris went to the shanty. Mr. Mullane went down the track towards Des Arc. He further testified that Mrs. Mullane and the men with her were in sight of him at intervals for a period of three or four hours, and that he saw no indications of trouble among them. After an hour and a half or two hours, Mrs. Mullane and Middleton and others went from the shanty to a barn close by. Mullane went to Des Arc and inquired for a justice of the peace. He told Mr. D. M. Long that he "wanted help to get his wife." He told Mr. Brawley that "a crowd of men had taken his wife away from him." He told the constable, Mr. Daniels, that he had "come for help, for someone to protect his wife that he left up there near Annapolis with a gang of men." Daniels, Brawley and Long went to the barn and arrested the defendant Parris and others about 4:30 in the afternoon. The Mullanes stayed a short while at Des Arc and then went to Poplar Bluff. While there she had him arrested for breach of the peace, and sought to have him prosecuted for carrying a pistol. For that purpose, she called on the chief of police of Poplar Bluff, Mr. Samuel Gardner. He testified for the defense as follows:

"Q. Did she make this statement in this conversation, 'I am not going back to Ironton to court,' and you said, 'why?' A. Yes, sir.

"Q. And she said, 'Because I did not tell the truth on the other trial,' and, 'If I have to go back, I will tell the truth?' A. Yes, sir.

"Q. Did she say in that connection that the man did not do as she stated on the other trial? A. Yes, sir.

"Q. And did she further state, 'My husband said for me to go with them, as we needed the money?' A. yes, sir.

"Q. Did she make this statement, 'I got thirty cents and gave it to my husband?' A. That is right.

"Q. Then you say you directed her to the prosecuting attorney? A. Yes, sir."

On cross-examination he said:

"A. Well, I'm not positive, but I think that was the second time, or probably the third time that I had had him in jail there and he had been drinking very hard, and I might say in what we consider police language that he was snaky, he was all tore to pieces from drink.

"Q. I will ask you if it isn't true that Mr. Mullane while in your presence, that you noticed and knew that his fear was terrific about coming back here and that he was even afraid to stay there? A. He was of a disposition, as I said, from drink and also he was kind of a frighty nature, and his whole hobby seemed to be to carry guns.

"Q. But he was afraid too all the time, wasn't he? A. He said so; he told me after he got in jail that he was afraid they were going to mob him."

Soon after that Mr. Mullane disappeared and has not been heard from since.

Mr. Almon Ing, prosecuting attorney of Butler county, and who had also held the same office in Wayne county testified for the defense that Mrs. Mullane called to consult him about prosecuting her husband for being drunk and making trouble for her and for carrying a gun, and for abusing her. He testified that in speaking of this case she said that the boys did not threaten her, that they did not force her, and that she did not fight, strike or kick them, that she just submitted, and that her husband was to blame for the whole thing. She made a written affidavit to the

same effect which was read in evidence by the defendant.

## OPINION.

The statement of facts is equivalent to an opinion in this case. *Res ipsa loquitur*. Along that railroad south of Annapolis from nine in the morning until late in the afternoon there was a carnival of lust, but there is no substantial indication that any rape was committed. Lucy and Thompson, witnesses for the State, passing along the railroad, intent on their business, heard one of the crowd, in the inception of the affair, say, "We will put them on to her," or, "We'll wait and let those other fellows tackle her." That was after Mullane had gone back and talked to the men and had started back down the track. Lucy and Thompson saw no sign of trouble, and it did not occur to them that a rape was being arranged for. The language used was such as would have been used where the speaker thought that the woman was willing, but was not such as would come from the mouth of a ravisher. Two other reputable citizens, at least they are not attacked, John Jackson and Drew Lewis, hunting hogs, saw the affair between this defendant and Mrs. Mullané. They testified that she made no resistance, and that her husband called to her saying, "Now, Lillie, if you are through with the boys, let's go." She concedes the truth of that statement as to what her husband said.

Lemro Kelly, a defendant, put on the stand by the State, testified that he had intercourse with her, but that he was compelled to do it by the other defendants. Those two, against their consent, were sent down the railroad, and off to a place of concealment in order that he, unwilling as he was, might ravish her. Strange to say, he was the only one whose attempt she did not resist. Railroad men, singly and in squads, passed along that track, saw her and the

·men with her, were close to them, saw no sign of trouble and heard no call for help. Robert Seals and three others were working for hours in sight of her and the men when they would at intervals come from cover, and they got no word or sign to indicate that a rape was being committed.

When Mullane got to Des Arc he did not say that his wife had been ravished. He told Long that he "wanted help to get his wife." He told Brawley that "a crowd of men had taken his wife away from him." He told Daniels that he had come "for some one to protect his wife that he left up there near Annapolis with a gang of men." That is the language of a man who was dissatisfied that his traveling companion was detained by the way. It was not the language of a man whose wife had been ravished.

Her statements to the chief of police of Poplar Bluff and to Mr. Ing, the prosecuting attorney of Butler county, and her affidavit read in evidence, utterly destroy the value of her evidence at the trial. We are impressed with the fact that there is no evidence to indicate that she got more than thirty cents as the price of her shame. It is hard to understand why she should go through with the experience of that day with no greater financial reward. It is the only point in the State's case, and it is a strong one, but, strong as it is, it is overwhelmed by the fact that there is no substantial evidence of rape. We haven't any doubt that there were many times during that day when a call or a gesture from Mrs. Mullane would have brought the whole community to her rescue. Strong as is lust, it is shame-faced and flees from the countenance of a community roused in defense of woman. Woman instinctively knows that such is the case. Having failed during almost a whole day to call for protection which was right at her hand, it is too late to ask the court to send the votaries of lust to the penitentiary for rape. *Volenti non fit injuria.*

The judgment is reversed and defendant discharged. *Williams, C.,* concurs.

PER CURIAM.—The foregoing opinion of ROY, C., is adopted as the opinion of the court. All the judges concur.